IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO

UNITED STATES OF AMERICA,                    Case No. 1:20-CR-767

        Plaintiff,

        -vs-

                                      JUDGE PAMELA A. BARKER

GERALD M. COOK, JR.,

        Defendant.                    MEMORANDUM OPINION & ORDER

The subject of this Memorandum Opinion and Order are three motions to suppress filed by Defendant Gerald M. Cook, Jr. (" Cook" or "Defendant"):  (1) Motion to Suppress Search of Euclid Residence on October 2, 2020 filed on September 24, 2024, that included a request for a *Franks* hearing ("Defendant's First Motion") (Doc. No. 71)[1];  (2) Motion to Suppress All Post Arrest Statements on August 16, 2020 filed on September 24, 2024 ("Defendant's Second Motion") (Doc. No. 72); and (3) Motion to Suppress Unlawful Search of the Vehicle on August 16, 2020 ("Defendant's Third Motion") (Doc. No. 73.)  On October 1, 2024, the United States of America filed a Consolidated Response in Opposition to Defendant's Suppression Motions (ECF'S 71, 72, and 73) ("the Government's Response").  (Doc. No. 80.)  On October 3, 2024, the United States of America filed a Supplement to Government's Response in Opposition at ECF 80 (Filing of Video From Back Seat of Willoughby Police Vehicle.)  (Doc. No. 81.)  On October 10, 2024, Defendant filed a Consolidated Reply in Support of Defendant's Motions to Suppress (R. 71, 72, and 73) ("Defendant's

---

[1] On September 25, 2024, Defendant filed under seal, Defendant's Exhibit F In Support of Defendant's First Motion to Suppress.  (Doc. No. 76.)

Reply").  (Doc. No. 84.)  In Defendant's Reply, Defendant requested an oral hearing, which was conducted on October 21, 2024.  At the conclusion of the hearing, the parties were directed to file post-hearing briefs as to certain issues raised during the hearing.  On November 12, 2024 the Government filed its Post-Suppression Hearing Brief ("Government's Hearing Brief") and Defendant filed his Notice of Defendant's Motion to Suppress (R. 72, R. 73) Post Hearing Brief ("Defendant's Hearing Brief").  (Doc. Nos. 93 and 94.)

## I.    Procedural History and Background

On November 19, 2020, an eight-count indictment was filed against Cook.  (Doc. No. 1.) Count I charged Cook with Felon in Possession of Firearm on or about August 16, 2020, in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2).  Count 2 charged Cook with Distribution of Controlled Substances on or about September 25, 2020, in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(C). Count 3 charged Cook with Distribution of Controlled Substances on or about September 28, 2020, in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(C).   Count 4 charged Cook with Possession with Intent to Distribute Controlled Substances, on or about October 2, 2020, in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(B).  Counts 5 and 6 charged Cook with Possession with Intent to Distribute Controlled Substances, on or about October 2, 2020, in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(C). Count 7 charged Cook with Felon in Possession of Firearms, on or about October 2, 2020, in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2).  Count 8 charged Cook with Possession of Firearm in Furtherance of Drug Trafficking Crime, on or about October 2, 2020, in violation of 18 U.S.C. § 924(c)(1)(A)(i).

Since the indictment was filed on November 19, 2020, Cook has requested and received numerous continuances of the pretrial and trial dates and has been represented by six different court-

2

appointed lawyers.  Cook also represented himself for a short period of time between his fourth and fifth attorneys.  On May 2, 2024, in anticipation of the trial of the matter then set for June 3, 2024, and after having been given an extension of time until May 3, 2024 to file pretrial motions, Cook's fifth court-appointed attorney filed a motion to suppress the search of Cook's Gay Street residence in Euclid, arguing that "the search was based upon an affidavit which did not contain sufficient probable cause" and "[i]n particular, Cooks argues that there was not a sufficient nexus between prior controlled buys and the residence on Gay Ave."  (Doc. No. 60,  PageID #303.)  Cook's counsel acknowledged that the affidavit described two controlled buys at the Gay Ave. residence, one on September 25 and one on September 28, 2020, and that the search occurred shortly thereafter on October 2, 2020.  Cook's counsel also acknowledged that there were audio recordings of the controlled buys but according to him, they "d[o] not seem to contain incriminating conversations." *Id.*, PageID # 304.)

The Government responded in opposition.  (Doc. No. 61.)  The Government outlined the facts set forth in the affidavit submitted for the search warrant and noted that the search warrant had been signed by a judge of the Cuyahoga County Court of Common Pleas.  (*Id.*, PageID #s 319, 321.)  The Government argued that the information from the CI about Cook selling drugs out of the residence on Gay Street and the two controlled buys easily established probable cause to search the residence; but even if the affidavit did lack probable cause the good faith exception to the exclusionary rule would preclude suppression of the evidence found during the search.  (*Id.*, PageID #s 319, 322.)

During the scheduled suppression hearing on May 20, 2024, the Government placed its arguments in opposition to Cook's suppression motion on the record, but when the Court requested a response or argument in opposition, Defendant's then-counsel stated that he had been instructed by

3

Cook to withdraw his suppression motion. (Doc. No. 78, PageID #s 424-428.) The Court then noted that the previous attorneys appointed by the Court to represent Cook had declined to file a motion to suppress. (*Id*., PageID # 429.) The Court stated that after its review of the motion and the arguments raised therein and the Government's response, and having reviewed the four corners of the affidavit, it found the motion to suppress to lack merit. (*Id*., PageID #s 429-430.) However, the Court asked Cook's fifth-appointed counsel to weigh in on the merits of the suppression motion for purposes of evaluating Cook's instruction that he move to withdraw it. (*Id.*, PageID # 430.) Cook's counsel responded in relevant part that "I must agree that the motion to suppress is probably not meritorious I would agree with my five other colleagues…." (*Id.*, PageID # 430.)

The Court then proceeded to place on the record why it would deny the motion to suppress if Cook had not asked for it to be withdrawn. The Court detailed the averments in the affidavit, the relevant case law, and the bases for finding that the motion to suppress had no merit. (*Id.*, PageID #s 431-436.)

Cook's counsel then asked for leave to file an untimely *Franks* motion, based on "Sergeant Scipione say[ing] that he saw the defendant exit the back of the house, and from the pictures and the evidence that [he] [had], Sergeant Scipione was in the front of the house." (*Id.*, PageID #s 441-42.) After the Government explained that the same discovery had been provided to each of Cook's four previous attorneys, none of whom had decided to file any suppression motions, and that any *Franks* claim would fail on the merits, and given the untimeliness of the motion, the Court denied Cook's counsel's request. (*Id.*, PageID #s 428, 436-44.)

The case was scheduled for trial on June 3, 2024 but due to circumstances discussed under seal on the morning of trial, the Court removed Cook's fifth court-appointed counsel and appointed

4

new counsel for Cook who, on behalf of and with the consent of Cook, requested a continuance of the trial. The Court granted the motion to continue the trial.

As set forth above, Defendant's First Motion, Second Motion and Third Motion were then filed, the Government responded in opposition, and Defendant then filed his Reply thereto. The Government asserts that the three suppression motions filed by the sixth court-appointed counsel are all based on the same discovery provided to Cook's five previous lawyers, as well as to Cook himself when he was proceeding *pro se*.

## II.     Facts and Arguments

The Government's initial response to the filing of Defendant's three motions to suppress is that this Court can deny all of them without reaching their merits since Cook has failed to show any good reason for having a second suppression hearing. The Government contends that a defendant's acquisition of new counsel after an unsuccessful suppression hearing is not, by itself, an adequate reason to reopen the earlier hearing; and even if a defendant does provide an adequate explanation for why a claim was not raised at the earlier hearing, "'the timeliness of the motion, the character of the testimony, the effect of granting the motion, and whether the opposing party will be prejudiced by reopening the hearing should be considered.'" (Doc. No. 80, PageID # 468, citing *United States v. Holland*, 522 Fed. App'x 265, 270 (6th Cir. 2013); and *United States v. White*, 455 Fed. App'x 647, 650-51 (6th Cir. 2012)).

The Government correctly points to the fact that despite Cook withdrawing his motion to suppress at the hearing on May 20, 2024, the Court found it was without merit. The Government also correctly represents that the Court's denial of Cook's request to file a *Franks* motion was based in part on the fact that each of Cook's previous attorneys had received the same discovery. The

Government then asserts that the three suppression motions filed by the sixth court-appointed counsel are all based on the same discovery provided to Cook's five previous lawyers, as well as to Cook himself when he was proceeding *pro se*.  According to the Government then, Cook's lack of explanation for why these claims were not raised as part of the May 20th suppression hearing alone is sufficient to deny his three motions.

As to the factors that the Government submits the Court must consider in determining whether to reopen the suppression hearing, the Government asserts that these factors weigh against Cook being granted leave to litigate more suppression claims.  The Government notes that the case has been pending since December 2020 and during that time Cook has been represented by six different lawyers and himself, and all the lawyers and Cook received the same discovery, the Government's discovery disclosures have been essentially the same for the entire pendency of the case, and the indictment has remained unchanged.  The Government argues that as to prejudice, the reopening of the hearing would force it to defend its position against evidence that could have been mustered at the first hearing.  Finally, the Government contends that to the extent Cook may argue that the suppression claims raised in his three pending motions are different from the ones his prior counsel raised (or tried to raise) in May 2024, "that argument would fail because 'courts apply the same test when deciding … whether to reopen a suppression hearing to address issues not previously raised by prior suppression motion[s,]'" citing *United States v. Walker*, No. 1:10-CR 649, 2024 WL 3401182 at *4 (N.D. Ohio July 12, 2024 (Oliver, J.) (citing *United States v. Adams*, 655 F. App'x 312, 321 (6th Cir. 2016) and *United States v. James*, 2020 WL 13598804, at *4 (6th Cir. Jul. 21, 2020)).

In Defendant's Reply, Cook's current counsel asserts that "the issues raised by [Cook's fifth appointed counsel] Attorney Heindel are significantly different from the issues raised in the pending

6

Motions to Suppress" in that prior counsel's motion to suppress "did not challenge the alleged identification from the CI, the alleged observations of law enforcement, and did not raise any *Franks* challenges to the search warrant Affidavit." (Doc. No. 84, PageID # 503.)  Current counsel argues that she is not asking that this Court reopen the suppression hearing because the previous motion to suppress was withdrawn, and therefore a full merit hearing was not held.  Current counsel asserts that "Cook does not need to provide an explanation as to why any of his prior counsel did not raise the current issues presented because his instant Motions to Suppress were timely filed and raise factual and legal challenges that have not been previously ruled on by this Court." (*Id.,* PageID # 505.)

During the hearing held on October 21, 2024, after considering the briefing associated with Defendant's First Motion, relevant case law, and arguments made during the hearing, the Court denied Defendant's First Motion for the reasons stated on the record. (Doc. No. 90, PageID #s 524-48.)  Those reasons will not be restated herein.

As to Defendant's Second Motion, Cook asks this Court to suppress any statements made by him after being taken into custody on August 16, 2020, due to what he asserts was "unlawful questioning of [him] once he was seized without first providing *Miranda* warnings." (Doc. No. 72, PageID # 400.)  As to Defendant's Third Motion, Cook asks this Court to suppress the search of the motor vehicle on August 16, 2020, following a traffic stop for minor traffic violations because the officers did not have probable cause for the warrantless search of the parked vehicle. (Doc. No. 73, PageID # 408.)  In response to both motions, again the Government asserts that the Court can deny them without reaching the merits because Cook failed to show any good reason to have a second suppression hearing; and the Government argues that an evidentiary hearing on both motions is not required because Cook did not dispute any of the facts underlying these motions and even attached

7

the Willoughby Police incident report in support of Defendant's Second Motion.  (Doc. No. 80, PageID #s 468-70,  480.)

Nonetheless, the Government addresses the merits of Defendant's Second Motion and Defendant's Third Motion.  As to Defendant's Second Motion, the Government asserts that "Cook's motion does not specify what statements he believes were made in violation of *Miranda*."  (Doc. No. 80, PageID # 479.)  According to the Government, "[a]t most, his motion says that 'the government intends to play at trial portions of Cook's statements to law enforcement [o]fficers after being placed in handcuffs, detained in the back seat of a cruiser, and responding to questions asked by law enforcement officers without first being provided his *Miranda* warnings.'  ([ECF 72: Mot. To Suppress Statements], PageID 401-02."  (*Id.*)  Therefore, the Government "assume[d] Cook [was] seeking to suppress the statements made while handcuffed in the backseat of the Willoughby Police vehicle, when he muttered, '*report the car stolen, please man*.'"  (*Id.*)  Then, the Government proceeds to argue that because Cook's statements made while in the back seat of the police car were not made in response to police interrogation or its functional equivalent, and unless Cook can prove otherwise, they are not subject to *Miranda*.  (*Id.*, PageID # 479, 482.)  And, per the Government, because Cook has not submitted any evidence in support of his claim, Cook's voluntary statements in the back seat of the police cruiser are not implicated by *Miranda*.

In Defendant's Reply, Cook acknowledges that the defense "does not know what statements the government intends to introduce at trial from Cook as a result of the unlawful stop and seizure of Cook on August 16, 2020 at trial[, so] [a]s a result, the defense wants to ensure that no unlawfully obtained statements made by Cook are introduced at trial, either through law enforcement testimony

8

and/or video evidence because Cook was not provided with his *Miranda* warnings by law enforcement on August 16, 2020."  (Doc. No. 84, PageID # 509.)

As to Defendant's Third Motion, the Government asserts that this motion fails because:  Cook disclaimed any legitimate expectation of privacy after he walked away from the vehicle and denied operating or being inside of it; and because police saw the handgun in plain view in the center console.  (Doc. No. 80, PageID #s 483-88.)   In Defendant's Reply, Cook asserts that he "did not deny 'operating or being inside the Porsche' when police confronted him, and that the firearm located in the vehicle was not in plain view.  (Doc. No. 84, PageID #s 510-12.)  According to Cook, he "disputes many material facts alleged by the government in its response in opposition, warranting an oral hearing on the issues raised herein…."  (*Id.*, PageID # 512.)

During the hearing held on October 21, 2024 and as regards Defendant's Second Motion and Defendant's Third Motion, the Government reiterated its two procedural arguments as to why a hearing on the merits thereof should not be held:  first, because Cook was attempting to reopen his suppression hearing; and second, because in the motions, Cook did not challenge the underlying facts, but did so only in Defendant's Reply.  (*Id.*, PageID #s 550-51.)  In response to the first procedural argument raised by the Government, defense counsel argued that because no suppression motion had been filed previously regarding the Willoughby charge, specifically the charge of felon in possession of a firearm on August 16, 2020 set forth in Count 1 of the Indictment, the argument of reopening a hearing was not the same as it was for the Gay Street residence.  In response to the second procedural argument raised by the Government, defense counsel represented that "[w]ith regard to the factual allegations, we raised the same challenges as to the search and the *Miranda* issues, and then the Government in its response alleged that the search was based upon plain view and alleged that the

search was based upon other instances that were not contained within the reports." (Doc. No. 90, PageID #s 553-54.)  Further explaining, defense counsel stated: "So our reply addresses the Constitutional grounds that the Government then stated were the reasons for supporting the search. So that is the reason why they were not raised in the preliminary motion, is because I'm not going to assume that the officer is going to state plain view.  I believe that that's something that the Government needs to raise as to why the vehicle was searched.  We did contest that the search was unlawful." (*Id.*, PageID # 554.)      The Court concluded that because Defendant's First Motion involved the search of Cook's Gay Street residence that had been raised by prior defense counsel and the merits had previously been evaluated by the Court, but the issues raised in Defendant's Second Motion and Defendant's Third Motion had not been raised or evaluated previously, and - with the Government "appreciat[ing] *** some distinguishing factors between them" - it would proceed to conduct the hearing to evaluate the merits of Defendant's second and third motions. (*Id.*, PageID #s 554-55.)

The Government then called two witnesses, Willoughby Detective Daniel Lastoria ("Lastoria") and Willoughby Officer Kyle Dunphy ("Dunphy").  Upon direct examination, Lastoria testified in relevant part as follows.  On August 16, 2020, Lastoria was a patrolman for the Willoughby Police Department and was involved in the arrest of Cook.  Lastoria was in a marked police cruiser and while stopped at the intersection of State Route 91 and Maplegrove facing eastbound for a red traffic light, he witnessed a darker colored Porsche SUV traveling westbound opposite him, proceed into the intersection despite having a red traffic light, stop in the intersection, and then continue onward through the intersection when the light was still red.  As the vehicle passed him, he saw just one person, the driver, in the vehicle.  Lastoria turned around, followed the vehicle,

10

saw it turn left into the Skylight Hotel, and followed it into the parking lot of the hotel.  Lastoria then initiated a traffic stop, meaning that he activated his overhead lights and siren, which activates the dash cam.

Lastoria saw the vehicle pull all the way about to the front door of the hotel lobby before stopping and he pulled his cruiser directly behind it.  At that time, Cook was already out of the vehicle starting to walk towards the lobby.  On his way to speak to Cook, Lastoria encountered a female who told him that the Porsche belonged to her friend Jerry "later identified as Mr. Cook" and that she was meeting him there.  (*Id.*, PageID # 564.)  According to Lastoria, Dunphy arrived and stayed at the car to keep it secure.  Then Lastoria went inside to speak with Cook and explained to him why he was being stopped.  According to Lastoria, Cook denied being the driver of the car or having anything to do with the vehicle.  Then Dunphy, while outside of the hotel by the vehicle, made a gesture to detain Cook, and so Lastoria detained Cook by placing him in handcuffs, escorted him to his police cruiser and placed Cook in the back seat of the cruiser and closed the door.  According to Lastoria, there was a camera in the back seat of his cruiser which is activated when the lights and dash camera are activated, it shows the entire back seat, and both the video and audio were properly working and functioning on August 16, 2020.  From the point in time that Lastoria arrested Cook and placed him in the driver's side of the back seat of the cruiser and during the time that Cook was in the back seat of his cruiser, Lastoria did not engage in any kind of interrogation or questioning of Cook.

After Lastoria placed Cook in the back seat of his police cruiser, Dunphy told him that he had recovered a firearm in the front seat of the Porsche.  Lastoria participated in the search inventory of the Porsche which was required because the vehicle was being towed.  When shown Government's Exhibit 3A, Lastoria testified that it showed the back seat of his cruiser with Cook sitting inside.  In

11

the 12-seconds snippet of Exhibit 3A played for him, Lastoria heard Cook talking to someone on what the video showed was a cell phone located next to Cook's right hip, asking the person to report the car stolen.  According to Lastoria, this statement was not made in response to any questioning by him or anyone from his department on scene.  After Cook was detained in the back seat of the cruiser: the firearm in the Porsche was recovered from the center console; it was determined through a background check that Cook had a suspended driver's license; it was determined through a database reviewed on scene that Cook did not have a concealed carry weapon permit; and Lastoria asked Cook if he had anything illegal on him.

On cross-examination, Lastoria testified in relevant part as follows.  On August 16, 2020, the City of Willoughby did not have body cameras issued to their patrolmen.  As Lastoria got behind the vehicle, he activated his lights, he "believe[d]," prior to turning into the Skylight Inn or hotel.  (*Id.*, PageID # 582.)  Lastoria testified that Cook exiting the Porsche "[s]hould" have been shown on his dash camera because he had already activated the lights and therefore the dash camera by that point in time.  (*Id.*, PageID # 583.)  According to Lastoria, he did not call for back-up but when a traffic stop is initiated, "typically a backup officer automatically responds."  (*Id.*)

When shown Defendant's Exhibit A, at the approximate 8 seconds mark, Lastoria agreed that the dash camera does not show him exiting his cruiser and following a driver into the lobby of the hotel; and when shown Defendant's Exhibit A, at the approximate 20 seconds mark, Lastoria confirmed the dash camera showed the driver's and passenger's doors open.  According to Lastoria, the video at the approximate 20 seconds mark showed the vehicle after Dunphy had searched the vehicle.  And Lastoria "believe[d]", then, that the dash camera video, i.e., Defendant's Exhibit A,

started recording after Cook was in custody.  (*Id.*, PageID # 588.)  Lastoria also testified that he did not believe that he informed Cook that he would be recorded while in the back seat of his cruiser.

Upon re-direct examination, Lastoria testified "based upon [his] review of both videos," that "[i]t appear[ed]" "fair to assume that he did not activate [his] lights and/or sirens until after Mr. Cook was detained and placed back in [his] car."  (*Id.*, PageID #s 590.)  Lastoria explained that Cook was exiting the vehicle when he was pulling up and before he exited his car.  And Lastoria confirmed that the female shown in Defendant's Exhibit A was the female that he had testified he engaged with as he was heading into the hotel.  Lastoria confirmed that it was when he interacted with Cook in the lobby of the hotel that Cook denied having any knowledge of the car or anything in it ("Cook's statement").[2]  And upon re-direct examination, Lastoria confirmed that it was his common practice to activate his overhead lights if he was initiating a traffic stop.

Upon the Court asking additional questions of Lastoria he acknowledged that the portion of Defendant's Exhibit A shown to him by defense counsel did not show his lights activated – which was inconsistent with his practice of activating them upon making a traffic stop – and he had looked at the body camera footage prior to the hearing in preparation for it and there was no portion of what he reviewed showing his lights activated when he initiated the traffic stop.  Lastoria could not explain the discrepancy between his memory of activating his lights when he initiated the traffic stop of the vehicle and his dash camera not capturing the scene until after Cook had been detained.  Upon further

---

[2] Upon his re-direct of Lastoria, counsel for the Government's last question posed to him was the following:  "And in fact, my last question here, when you went in the lobby, your brief interaction with Mr. Cook before Officer Dunphy made that gesture to you, is that when Mr. Cook denied any – denied being inside the car or having any – anything to do with the Porsche Cayenne."  (*Id.*, PageID # 591.)  Lastoria responded as follows:  "Yeah, it was kind of all at the same time.  But yes, it was when I interacted with him in the lobby of the hotel is when he denied having any knowledge of the car or anything in it."  (*Id.*)  Counsel for the Government did not follow-up with Lastoria for any clarification or further testimony on this issue.

questioning by counsel for the Government, Lastoria testified that he did not know whether he did or did not activate his lights when he initiated the traffic stop and that the circumstances of the stop appeared to be different than his normal practice or typical traffic stop.  Upon further questioning by defense counsel, Lastoria could not recall any other incident where he activated his overhead lights where his dash camera did not activate.

Thus, the record reflects that during her cross-examination and re-cross of Lastoria, defense counsel focused on the discrepancy between Lastoria's testimony that he always activates his lights upon conducting a traffic stop, but the dash camera from his stop of the Porsche started recording after Cook had been detained.  (*Id.*, PageID #s 581-89, 592, 596-97.)  The only question that defense counsel asked Lastoria concerning his conversation with Cook before he detained him, was whether he had had any conversation with Cook prior to getting a look from Dunphy – presumably because Lastoria testified that when he got the look or signals from Dunphy he handcuffed/arrested Cook - to which Lastoria testified he could not be certain what was said or if there was anything more than just trying to get his attention, and to let him know that he was being stopped.  But the record, specifically the last question posed to Lastoria by counsel for the Government and Lastoria's response to it, also demonstrates that the Government understood defense counsel's cross-examination of Lastoria to include developing testimony concerning whether Cook's statement was made before or after he was handcuffed.  And, during his re-direct of Lastoria, counsel for the Government did not ask any additional questions of Lastoria to attempt to clarify his testimony on this issue.

Upon direct examination, Dunphy testified in relevant part as follows.  On August 16, 2020, his zone partner, Lastoria, had initiated a traffic stop in the parking lot of the Skylight Inn in Willoughby, and so he went to provide back up.  When he first pulled into the parking lot, he did not

14

see the other officer on scene – was not sure where he was – but he pulled up behind Lastoria's vehicle and parked and got out and other than the police car, saw two vehicles – one a black Porsche SUV and the other, what he believes was a sedan.  The black Porsche was in front of the zone car. He believes there was a female on scene.  As Dunphy proceeded to walk to the hotel, he had to walk past Lastoria's zone car and he was able to look in the black Porsche – he was primarily looking for people – and despite the doors being closed, he could see through the window from the driver's side of the Porsche and he observed a firearm in the cup holder in the center console right behind the shifter.  There were not any objects or anything that obstructed his view of the firearm in the cup holder.  He could see the handle and rear slide of the firearm.  Dunphy was several inches to a foot from the Porsche when he looked inside it.  On August 16, 2020, it was not lawful or legal to transport or carry a loaded firearm in a car.  Very shortly after seeing the firearm, he saw Lastoria interacting with the subject and he made a hand gesture "indicating cuffs," "with the finger gun."  (*Id.*, PageID # 605.)  The firearm that he saw in the Porsche was recovered during the inventory of the vehicle in preparation for towing it.  Dunphy learned that the firearm he saw was loaded.  He did not remember having any interaction with Cook; if he did, it was minimal; and he did not engage in any sort of questioning or interrogation of Cook while he was in the back seat of Lastoria's vehicle.

Upon cross-examination, Dunphy testified that he had never seen Defendant's Exhibit A before, but he was familiar with the vehicle shown in the video because he provided back-up on the traffic stop involving it.  Dunphy also testified that he checked the other vehicle parked in front of the Porsche to make sure there was nobody in it and while doing that, because of its position, he saw Lastoria and the subject inside the lobby.  Dunphy testified that he did not search the Porsche but did

participate in the tow inventory of it, and he did not know if prior to performing the tow inventory any officer had performed a search of the vehicle.

Upon re-direct Dunphy testified that when he saw the firearm in the center console of the Porsche he believed that it was a firearm, and he confirmed that Government's Exhibit 6 depicted the firearm he saw in the center console of the Porsche SUV.

After the testimony of Dunphy, the Government rested, and its exhibits were admitted into evidence; and defense counsel did not call any witnesses but Defendant's Exhibit 3A was admitted into evidence.  During his closing argument, counsel for the Government argued that Defendant's Second Motion should be denied because the evidence demonstrated that "any statements made by the defendant while in the back seat of Officer Lastoria's car were voluntary and, importantly, they were not made as a result of or in response to any direct or indirect law enforcement action, questioning, express or otherwise, or its functional equivalent."  (*Id.*, PageID # 632.)  Counsel for the Government argued that Defendant's Third Motion should be denied because the evidence demonstrated that the firearm in question first observed by Dunphy was in plain view.  And, according to the Government, because Cook – at the time he was not yet detained – disclaimed any interest in or being the driver of the Porsche, and therefore had no expectation of privacy regarding the firearm located in the Porsche, he did not have standing to argue that the firearm be suppressed.

In her closing argument, defense counsel argued that the evidence demonstrated that no valid traffic stop actually occurred and that the firearm in the Porsche was not clearly contraband in plain view that would justify the detention of Cook  And defense counsel argued that the evidence demonstrated that the vehicle had been searched prior to any sort of tow inventory and therefore, the search was unlawful because there was no justifiable reason to search the vehicle at the time they did.

16

Also, defense counsel argued that since there is no recording of Cook's statement, no such statement was made.  (*Id.*, PageID # 647.)[3]   Indeed, it was during her closing argument that defense counsel first raised an argument about the admissibility of Cook's statement to Lastoria in the hotel lobby, including whether Cook was in handcuffs at the time he made that statement.  (*Id.*, PageID #s 647-53.)

Counsel for the Government asked to re-open the hearing and recall Lastoria to clarify when in relation to hearing Cook's statement he placed Cook in handcuffs.  However, counsel for the Government's recollection of Lastoria's testimony on the issue was that on direct examination, Lastoria testified that he heard Cook's statement and then Dunphy gestured to him, and on redirect Lastoria testified that Dunphy's gesture and Cook's statement to him were happening at the same time.  Indeed, counsel for the Government acknowledged that Lastoria's testimony on the issue had been "murky."  Yet, he had not attempted to clarify his testimony during his re-direct of Lastoria. (*Id.*, PageID # 654.)  So, defense counsel objected to recalling Lastoria, and the Court indicated that it would rely on the transcript of the Lastoria's testimony to evaluate the issue.

At the conclusion of the hearing, the Court asked counsel for the parties to submit post-hearing briefing to address two issues:  1.) whether Cook's statement to Detective Lastoria in the lobby of the Skylight Inn was the product of custodial interrogation under *Miranda*; and 2.) whether any case law supports defense counsel's argument about the officers being obligated to warn Cook that he would be recorded in the backseat of their police cruiser.

---

[3] Indeed, this argument that Cook's statement was not made is the same argument made in Defendant's Second Motion, which the Government has asserted is the basis for its argument that in that motion, Cook failed to raise the argument that Cook's statement was made after he was handcuffed and detained so as to preclude the Government from introducing testimony from Lastoria about Cook's statement.

In the Government's Hearing Brief, the Government first contends that Cook's statement to Lastoria in the lobby of the Skylight Inn was not the product of custodial interrogation under *Miranda* and makes three arguments in support thereof.  First, the Government argues that Cook forfeited his claim that because he was handcuffed and detained by law enforcement and not *Mirandized* Cook's statement should be suppressed, because Cook raised it for the first time during the hearing and after the close of evidence.  According to the Government, Defendant's Second Motion was "largely generic;" it did not specify what statements Cook believed were obtained in violation of *Miranda* and "[a]t most, Cook's motion said that 'the government intends to play at trial portions of Cook's statements to law enforcement [o]fficers after being placed in handcuffs, detained in the back seat of a cruiser, and responding to questions asked by law enforcement officers without first being provided his *Miranda* warnings.'"  (Doc. No. 93, PageID # 684.)  Thus, per the Government, it "assume[d] Cook [was] seeking to suppress the statements he made while handcuffed in the backseat of the Willoughby Police," and therefore, "only addressed the admissibility of those specific statements." (*Id.*)  And the Government asserts that "Cook's reply brief did nothing to correct or expand the scope of his initial motion;" points out that "[a]ll Cook's reply brief said about his statement to Detective Lastoria (in which he denied any association with the Porsche) was that he never made that statement at all," correctly quoting from Defendant's Second Motion, Doc. No. 83, at PageID # 510.  (*Id.*)  The Government then submits that "going into the suppression hearing, the government believed that Cook's suppression motion…was limited to the statements he made in the back of the Willoughby Police cruiser."  (*Id.*, PageID # 685.)  The Government reiterates that at the hearing, Cook did not raise any arguments about the admissibility of his statement to Detective Lastoria until after testimony had concluded and that when the Government offered to recall Detective Lastoria to clarify whether

18

Cook's statement was made before or after Cook was handcuffed, counsel for Cook objected, and ultimately the Court advised that it would rely on the transcript of Lastoria's testimony to evaluate the issue.  The Government contends that the Court should find that Cook forfeited any *Miranda* challenge to Cook's statement by not timely raising it in his initial motion.

Second, the Government argues that even if Cook did not forfeit this claim, the record still shows that Cook's statement was made to Lastoria before being placed in handcuffs, meaning that *Miranda* warnings were not required.  The Government argues that the portion of Lastoria's testimony it quotes demonstrates that Cook's statement was not made while he was in handcuffs.

Third, according to the Government, even if this Court finds that Cook has met his burden to prove by a preponderance of the evidence that at the time of Cook's statement he was handcuffed and therefore *Miranda* applies to warrant exclusion of Cook's statement from the Government's case at trial, Cook's statement can still be considered to find that Cook has no standing to challenge the search of the Porsche because Cook's statement was not "actually coerced."

As to the second issue the Court asked the parties to address in their post-hearing briefs, the Government represents that it was unable to find any case law that would support defense counsel's claim that law enforcement was required to advise Cook that there was a video and audio being recorded of him in the back seat of the cruiser.

As a preliminary matter regarding Defendant's Hearing Brief, Cook's arguments that no traffic stop occurred, that the firearm was not in plain view, and that the search of the vehicle was not a "tow inventory" but an unlawful search of the vehicle, and the citations to the testimonies of Lastoria and Dunphy adduced at the hearing as set forth in support of these arguments are reiterations of arguments placed on the record during the hearing  and exceed the scope of what the Court instructed

counsel for the parties to address in their post-hearing briefs.  Therefore, the Court will consider only those portions of Defendant's Hearing Brief that address the two specific issues this Court directed the parties to brief after the hearing.

As to the first issue the Court asked counsel to address in the post-hearing briefs, defense counsel argues that based upon the totality of the facts and testimony, to specifically include the absence of a recording of Cook's statement and Lastoria's testimony quoted therein, the Government cannot establish that Cook made statements denying operating or being inside the Porsche and that any such statements were made by Cook prior to Cook being placed in custody.  According to Cook, then, Cook's statement cannot be used against Cook at trial and Cook does have standing to challenge what he submits was an unlawful search of the SUV.

As to the second issue the Court asked counsel to address in the post-hearing briefs, defense counsel argues that Cook was unlawfully recorded in the back seat of the cruiser since he was not advised that there was an audio and video recording of him in the back seat of the cruiser.  Therefore, according to Cook, any statements made by him while in the back seat of the police cruiser must be suppressed.  However, Cook does not cite any authority whatsoever for this proposition.  And defense counsel submits that if the Court finds that the statements made by Cook in the back seat of the cruiser are not subject to Fourth Amendment suppression, then "the defense respectfully reserves the right to further challenge the admissibility of this video in Motion(s) in Limine to be submitted by the defense four (4) weeks prior to trial."  (Doc. No. 94, PageID # 704.)

For the reasons more fully explained below, Defendant's Second Motion is granted in part and denied in part.  Specifically, Defendant's Second Motion is granted to the extent that the Court finds that the Government may not present during its case in chief Cook's statement disclaiming his

20

interest in the Porsche or use it to challenge Cook's standing to challenge the search of the Porsche. However, Defendant's Second Motion is denied to the extent that the Court finds that the Government may use evidence from the audio and video recording of Cook in the back seat of the police cruiser during its case in chief.  And, for the reasons more fully explained below, Defendant's Third Motion is denied.

III. <u>Analysis</u>

A. **Lastoria conducted a valid traffic stop of the Porsche.**

First, the Court rejects Cook's argument that a valid traffic stop of the Porsche did not occur. The Court finds Lastoria's testimony credible that he saw the Porsche proceed through a red light, turned his cruiser around to follow the Porsche into the Skylight Inn, watched the driver get out and walk into the lobby of the hotel, followed him into the hotel lobby after conversing with a female on scene, and spoke to Cook, and then upon seeing the gestures from Dunphy, handcuffed/arrested Cook..  While Lastoria acknowledged that his initial testimony that he always activates his lights for a traffic stop and did activate his lights as he stopped directly behind the Porsche in the hotel parking lot - which would have activated his dash cam video – was belied by the fact that the dash cam video did not capture these actions, he appeared to this Court to be absolutely befuddled by the fact that the dash cam video showed otherwise.  The Court construes his testimony and demeanor not as demonstrating his lack of credibility concerning the events of August 16, 2020, specifically to include that he saw the Porsche proceed through a red light and initiated a traffic stop, but as demonstrating that more than four years after the events of the traffic stop, he really believed that he activated his lights consistent with his usual practice.

21

**B. The Court finds that Cook did not forfeit his right to argue that Cook's [alleged] statement must be suppressed because he was detained/in handcuffs at the time of it.**

The next issue for the Court's determination is whether Cook forfeited his right to argue that Cook's [alleged] statement must be suppressed because he was detained/in handcuffs at the time any such statement was made, because Cook did not raise it in his opening motion or brief but only in his reply, and he did not raise any specific argument associated therewith until defense counsel gave her closing argument.  However, the Government itself quotes from Defendant's Second Motion wherein defense counsel wrote that "the government intends to play at trial portions of Cook's statements to law enforcement [o]fficers **after being placed in handcuffs**, detained in the back seat of a cruiser, and responding to questions by law enforcement officers without first being provided his *Miranda* warnings**.**"  (Doc. No. 93, PageID # 684) (emphasis added).  So, arguably the Government was or should have been on notice that the issue of when Cook was handcuffed would be an issue in determining what statements should be suppressed per Defendant.  Certainly, the Court recognizes that the reading of the entire sentence understandably led the Government to assume or believe that Cook was challenging the statements he made while in the back seat of the cruiser.  But the question posed of Lastoria during defense counsel's cross examination of him concerning the timing of Cook's statement in relation to Lastoria handcuffing him put counsel for the Government on notice of the potential argument.  Indeed, it was during his re-direct of Lastoria that counsel for the Government posed a question to Lastoria on the issue, but did not attempt to clarify his testimony, even though he later acknowledged or recognized that Lastoria's testimony on the issue was "murky."

**C.  The Court rejects the Government's argument that the record shows that Cook's statement to Lastoria was made before he was placed in handcuffs.**

22

The Government concurs that Cook was "in custody" within the meaning of *Miranda* once Lastoria handcuffed him and concedes that the *Miranda* custody requirement is met the second that Cook was physically detained in handcuffs. (Doc. No. 93, PageID # 688, quoting from Doc. No. 90, PageID # 652.) However, the Government contends that Cook was not in handcuffs when he told Lastoria that he had no association with the Porsche, citing to portions of Lastoria's testimony given upon direct examination. But the additional testimony given by Lastoria on cross-examination and re-direct as more fully discussed above made his original testimony given upon direct examination "murky" or not clear. Indeed, it is based upon this Court's evaluation of all the testimony of Lastoria that it finds that the record is not clear that Cook's statement was made before he was handcuffed, and that Lastoria's full testimony, to include portions elicited upon cross-examination and re-direct, can be construed as failing to demonstrate that Cook's statement was made before he was handcuffed or demonstrating that Lastoria handcuffed Cook before Cook's statement was made. Accordingly, *Miranda* applies, and the Government is not permitted to use Cook's statement made to Lastoria in the hotel lobby disclaiming any interest or association with the Porsche, in its case at trial.

> **D. Cook's un-*Mirandized* statement disclaiming any interest in the Porsche cannot be used to resolve the issue of Cook's standing under the Fourth Amendment to challenge the search.**

The Government has raised the issue that because Cook left the Porsche in the parking lot of the hotel and when approached by Lastoria, denied that he was operating or had been inside the vehicle, he does not have standing to challenge the search of the Porsche. According to the Government, even if were to Court find – as the Court does - that the record fails to demonstrate that Cook was not handcuffed at the time Cook's statement was made to Lastoria so that Cook's statement cannot be used in the Government's case in chief, it can still be considered to resolve the separate

Fourth Amendment standing issue.  In support thereof, the Government cites *United States v. Patane*, 542 U.S. 630, 642-44 (2004), for the proposition that "although a statement obtained in violation of *Miranda* is suppressed at trial, **physical evidence** obtained as a result of that *Miranda* violation is not suppressed unless the statement was 'actually coerced.'"  (Doc. No. 93, PageID # 690) (emphasis added).  Then, the Government argues that "Cook's statement to Detective Lastoria was not "actually coerced" such that it would implicate the suppression of **physical evidence** under the Fourth Amendment.  (*Id.*, PageID # 691) (emphasis added).  And the Government points out that in *United States v. Burton*, 828 Fed. App'x 290, 293 (6th Cir. 2020), "the Sixth Circuit explained that determining whether a statement was 'actually coerced … is ultimately a question of voluntariness.'"

The Government argues that Cook's encounter with Lastoria in the lobby of the hotel has the same "hallmarks" of the encounter between the police and the defendant described in *Burton*.  (*Id.*)  The Government then submits that the following facts demonstrate that Cook's statement was voluntary:  Cook was in a public place, i.e., the lobby of a hotel, when he made his statement to Lastoria. the only police officer there; there is no evidence that Lastoria ever drew his weapon; and Lastoria's interaction in the hotel lobby was "brief," with Lastoria just explaining that he was trying to get Cook's attention and to let him know that he was being stopped.  (Doc. No. 90, PageID #s 584, 591.)

In *Burton*, the Sixth Circuit explained that "[t]he primary issue was whether the district court should have suppressed the gun and ammunition as 'fruit of the poisonous tree' because they were found as a result of Burton's un-*Mirandized* statement."  *Burton*, 828 F. App'x  at 292.  After quoting and/or citing from *Patane*, 542 U.S. at 637, *Chavez v. Martinez*, 538 U.S. 760, 764-68 (2003),

24

*Miranda v. Arizona*, 384 U.S. 694, 490 (1966), and *United States v. Levenderis*, 806 F.3d 390, 400

(6th Cir. 2015), the Sixth Circuit explained in relevant part as follows:

> Although statements made in violation of *Miranda* must be suppressed, **physical evidence** found because of voluntary, un-*Mirandized* statements may be admitted. *Patane*, 542 U.S. at 634 124 S.Ct. 2620 (plurality op.) ("[T]he *Miranda* rules protects against violations of the Self-Incrimination Clause, which, in turn, is not implicated by the introduction at trial of **physical evidence** resulting from voluntary statements…."); *id*. at 645, 124 S.Ct. 2620 ("Admission of **nontestimonial physical fruits** … does not run the risk of admitting into trial an accused's coerced incriminating statements against himself.") (Kennedy J., concurring in the judgment). Admitting **physical evidence** obtained because of a *Miranda* violation does not implicate a defendant's right against self-incrimination because "[t]he Fifth Amendment, of course, is not concerned with **nontestimonial evidence**." *Oregon v. Elstad*, 470 U.S. 298, 304, 105 S.Ct. 1285, 84 L.Ed.2d 222 (1985).
>
> ***
> In sum, a failure to provide a *Miranda* warning, standing alone, cannot justify the exclusion of **physical evidence** found because of the unwarned statements.  [Citation omitted.]   Typically, 'the exclusion of unwarned statements is a complete and sufficient remedy for any perceived *Miranda* violation.'  [Citation omitted.]  But unwarned statements must still have been voluntarily made. [Citation omitted.]  ***  If the statements were "actually coerced" then their physical fruits must also be excluded.  [Citation omitted.]  Thus, whether to admit **physical evidence** found because of an un-*Mirandized* statement is ultimately a question of voluntariness.

*Id*. at 292-93(emphasis added).

The Court does not construe or interpret *Patane* or *Burton* as supporting the Government's

argument that Cook's statement disclaiming an interest in the Porsche can be used to evaluate his

standing to challenge the search of the Porsche.  Cook's post-arrest statement disclaiming any interest

in the Porsche in response to questioning by Lastoria is not "physical evidence" but in effect, is

testimonial in that the Government is attempting to use it against him to claim he does not have

standing to challenge the search of the Porsche.  Indeed, Lastoria testified that he followed the Porsche

into the parking lot of the hotel, saw the driver (Cook) exit the driver's side of the vehicle and proceed

into the lobby of the hotel, and Lastoria followed him and encountered and spoke with Cook to tell

him that he was conducting a traffic stop of the Porsche.  And, to the extent that Dunphy gestured to Lastoria to handcuff/arrest Cook after seeing the firearm in the Porsche, arguably both Lastoria and Dunphy believed that Cook was the driver of the vehicle.  Also, the statements made by Cook in the back seat of the cruiser, which the Government argue are not the subject of custodial interrogation, also implicate Cook as the driver of the Porsche. So, the evidence presented at the hearing demonstrates to this Court that Cook was the driver of the vehicle.

The Government correctly quotes from the Sixth Circuit's decision in *United States v. Adams*, 583 F.3d 457, 463 (6th Cir. 2009), to wit: "the central inquiry in any suppression hearing is whether the defendant challenging the admission of evidence has shown a legitimate expectation of privacy in the place searched or the thing seized."  (Doc. No. 80, PageID # 483.)  And the Government correctly cites the Sixth Circuit's decision in *United States v. Peters*, 194 F.3d 692, 696 (6th Cir. 1999) for its assertion that "a legitimate expectation of privacy incorporates two elements:  first, that the defendant 'exhibited an actual (subjective) expectation of privacy; and second, that the defendant's subjective expectation is 'one that society is prepared to recognize as reasonable.'" (*Id.*, PageID #s 483-84.)  However, *Adams* and *Peters* did not involve circumstances like those involved herein.

Indeed, the Sixth Circuit's more recent opinion in *United States v. Rogers*, 97 F. 4th 1038 (6th Cir. 2024) is more instructive.  There, officers were responding to a reported domestic assault and were told that the suspected assailant had fled south, and to the south an officer saw a running vehicle parked by the road.  When the officer checked to see if the suspect was inside the vehicle he encountered the defendant alone in the passenger seat without a driver's license.  When asked, the defendant explained that the car belonged to his girlfriend who was nearby and emphasized that he

26

"wasn't even driving." *Id.*, 97 F.4th at 1040.  When the officer checked the defendant in a database, he discovered that the defendant had an outstanding felony warrant, so he arrested the defendant, impounded the vehicle and conducted an inventory search during which he found digital scales, plastic baggies, a large bag of marijuana, and a loaded pistol.  The Sixth Circuit did affirm the district court's conclusion that the defendant did not have standing to object to the search because he lacked a legitimate expectation of privacy in the interior of the vehicle because he was not the owner *nor the driver* of the car and failed to show that he had permission to occupy it.  However, it is the Sixth Circuit's discussion that is instructive for purposes of evaluating the Government's argument that Cook does not have standing to challenge the search of the Porsche.

In finding that the defendant in *Rogers* did not meet his burden of establishing his standing to challenge the search, the Court found that he never exhibited a subjective expectation of privacy at the time of the search of the vehicle[4] because he was "neither the owner **nor driver** of the vehicle" and he never showed that he had "complete dominion and control over the car," *Id.* at 1042 (citing *Rakas v. Illinois,* 439 U.S. 128 (1978) (emphasis added).  The Court explained that a subjective expectation of privacy is "established by one's conduct."  *Id.* (citation omitted).  The Court also explained that "by your 'actions and vigorous oral disclaimers' you may fail to exhibit any subjective expectation.  *United States v. Tolbert*, 692 F.2d 1041, 1045 (6th Cir. 1982)."  *Id.*  And in finding that the defendant did not have standing to challenge the search of what turned out to be his girlfriend's vehicle, the Sixth Circuit reasoned as follows:

> Here, not only did Rogers twice accurately inform the police that the [vehicle] was not his when asked, but he also had no ID and loudly disclaimed his authority over the

---

[4] The Court noted that although at the hearing on his motion to suppress, Rogers had showed, as it turned out, that he had permission to use his girlfriend's car, "he did not establish at the time of the search that he had a legitimate expectation of privacy."  *Rogers*, 97 F.4th at 1043.

vehicle, repeating to the officers that he 'wasn't even driving,' **when no officer had inquired either time**. His failure to exhibit an expectation of privacy at the time of the search prevents him from asserting one now to challenge that search in court.

*Id.* at 1042 (emphasis added).

Here, and because the Court cannot consider Cook's un-*Mirandized* statement disclaiming any interest in the Porsche (for the reasons explained above), and because the record or evidence demonstrates that no one disputes that Cook was the driver of the Porsche, the Court finds that Cook does have standing to challenge the search of the Porsche.

> **E. Officers were not required to warn Cook that the backseat of the police cruiser was recorded and therefore, un-*Mirandized* statements Cook made in the back seat of the police cruiser – which were not the subject of police custodial interrogation - are admissible.**

Lastoria testified that during the time that Cook was in the back seat of his police cruiser, he did not engage in any kind of interrogation or questioning of Cook, and the statement made while Cook was using his cell phone (and any text sent on it) was not made in response to any questioning by him or anyone from his department on scene. The only question posed of Cook by Lastoria was whether he had anything illegal on him, and according to Lastoria, it is a question that is routinely asked of an individual in custody who is being transported to jail, for safety reasons. Cook has not demonstrated otherwise or provided any support for the contention that the police officers were required to advise him that the back seat of the cruiser was being audio and video recorded. And the Court cautions defense counsel that any motion in limine filed in anticipation of the trial should not reiterate the same contention, unless between now and then, she is able to locate any support for it.

> **F. There was probable cause to search the vehicle because Dunphy saw a handgun in the center console after Cook walked away from the vehicle.**

The Government contends, and the Court agrees, that "the automobile exception to the Fourth Amendment allows officers to search a vehicle without a warrant if they have 'probable cause to believe that the vehicle contains evidence of a crime.' *United States v. Smith*, 510 F.3d 641, 647 (6th Cir. 2007) (citation omitted)." (Doc. No. 80, PageID # 486.) *See also*, *United States v. Galvez*, 645 F.3d 347, 355 (6th Cir. 2011).  And the Government submits, and the Court agrees that "under the Fourth Amendment plain-view doctrine, 'if police are lawfully in a position from which they view an object, if its incriminating character is immediately apparent, and if the officers have a lawful right of access to the object, they may seize it without a warrant.' *United States v. Herndon*, 501 F.3d 683, 602 (6th Cir. 2007)." (*Id.*)  Finally, the Government correctly quotes from *United States v. Campbell*, 549 F.3d 364, 373 (6th Cir. 2008) (citations omitted), to wit:  "a motorist has 'no legitimate expectation of privacy shielding that portion of the interior of an automobile which may be viewed from outside the vehicle by … diligent police officers." (*Id.*)

The Court finds Dunphy's testimony credible that in his capacity of providing back-up for Lastoria's traffic stop of the Porsche, he was able to see and actually saw a firearm in the center console of the parked Porsche in the parking lot of the Skylight Inn as he walked by and looked in to check to see if anyone was in it.  Since Dunphy saw the firearm in the center console of the Porsche, there was probable cause to enter the Porsche without a warrant, retrieve the firearm and search the Porshe for evidence of that crime.

For the reasons set forth above, Defendant's Second Motion (Doc. No. 72) is GRANTED IN PART AND DENIED IN PART, and Defendant's Third Motion (Doc. No. 73) is DENIED.

**IT IS SO ORDERED.**


 *s/Pamela A. Barker*
PAMELA A. BARKER
Date:  February 21, 2025        U. S. DISTRICT JUDGE

30